UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ERIC and LYSA UHLER, husband and wife and the marital community composed thereof,<br><br>Plaintiffs,<br><br>v.<br><br>TROOPER CHASE VAN CLEAVE, TROOPER BRENT MERTENS, and TROOPER ANDREW RAMOS,<br><br>Defendants. | Case No. C16-1278RSM<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PROTECTIVE ORDER |

## I.    INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for a Protective Order Limiting Discovery of Plaintiffs' Medical Records. Dkt. #19. Plaintiffs argue that the medical records sought by Defendants are not relevant, and that the requests for records sought by Defendants are overbroad and not proportional to the needs of the case. *Id.* Defendants respond that the records sought are relevant to Plaintiffs' claims and to their defenses. Dkt. #21. For the reasons set forth below, the Court disagrees with Defendants and GRANTS Plaintiffs' motion.

## II.    BACKGROUND

In this case, Plaintiffs allege as follows:

ORDER
PAGE - 1

5.1     Around 7:00p.m. on March 11, 2016, a man named Mutasim Hamid, who was driving a truck towing a flatbed car trailer, collided with Lysa Uhler's car on northbound I-405 south of SR 167.

5.2     The minor collision caused no injuries and the only notable damage was to Mrs. Uhler's side mirror.

5.3     Mr. Hamid and Mrs. Uhler pulled their cars to the side of the road. They used their phones to take pictures of the vehicles, and Mr. Hamid took pictures of Mrs. Uhler's driver's license and insurance card.

5.4     Mrs. Uhler took a picture of Mr. Hamid's driver's license, but he would not give her insurance information. Unsure of what to do, Mrs. Uhler called her husband (Eric), who was also driving home after they had eaten dinner together.

5.5     Mr. Uhler came to the scene and asked that Mr. Hamid provide insurance information. When Mr. Hamid refused, the Uhlers decided to go home. The Uhlers saw no reason to wait any longer on the side of a busy freeway in the dark and rain, as Mrs. Uhler could drive her car safely, and there were no injuries.

5.6     After the Uhlers left, Mr. Hamid called the police. He appeared to have difficulty speaking and understanding English, but eventually he alleged to the 911 dispatcher that he had been in a collision and that a man had come to the scene, "choked" him, and "took everything" he had in his car.

5.7     Washington State Troopers Chase Van Cleave, Brent Mertens, and Andrew Ramos responded to the scene of the collision.

5.8     Mr. Hamid repeated his allegations, but this time he said that the man who came to the scene had grabbed his shirt collar and stolen his keys. Trooper Ramos later noted in his report that Mr. Hamid "did not have the best English."

5.9     Mr. Hamid did not have any visible injuries or damage to his truck.

5.10    Trooper Mertens and Trooper Van Cleave used the pictures on Mr. Hamid's phone of the Uhlers' vehicles to look up their Department of Licensing photographs. Mr. Hamid identified Mrs. Uhler as the driver of the other vehicle, but he told Trooper Van Cleave that Eric Uhler did *not* look like the man who had come to the scene.

5.11    Troopers Mertens, Ramos, and Van Cleave decided to go to the Uhlers' home that night to follow up on Mr. Hamid's allegations.

ORDER
PAGE - 2

5.12    The Troopers had the Uhlers' phone number, but they chose not to call them first.

5.13    The Uhlers live on Shady Lake in unincorporated King County, east of Renton.

5.14    The Uhlers' property is connected to the street by a large circular driveway to the west of their house. A garage sits next to the house on the west side of the property.

5.15    A "Private Property: No Trespassing" sign is posted on the garage and is visible from the driveway as one approaches either the garage or the house.

5.16    A paved pathway and stairs leads from the driveway to the main entrance on the north side of the Uhlers' house. A porch light illuminates the entrance and the entrance has a doorbell.

5.17    On the south side of the home, a breezeway connects the garage to the house. A wood deck and paved pathway and stairs lead to another entrance on the south side of the house. This entrance also has a porch light and a doorbell.

5.18    The east side of the home faces Shady Lake. There is a large backyard that runs down to the lake and is bordered by a hedge to the north and a fence to the south. There is also a covered patio that is connected to the Uhlers' home. A door opens onto the patio from the Uhlers' daylight basement.

5.19    The patio door does not have a doorbell and is not visible from the driveway.

5.20    Troopers Mertens, Ramos, and Van Cleave arrived at the Uhlers' property around 9:00 pm.

5.21    Sunset that night was at 6:10PM and it was completely dark outside.

5.22    Instead of entering the driveway, the Troopers left their cars on the road and walked onto the Uhlers' property.

5.23    The Troopers examined the vehicles in the driveway and garage where the "No Trespassing" sign was posted.

ORDER
PAGE - 3

5.24     Instead of approaching either of the visible entrances on the north or south sides of the house, the Troopers walked down the side of the property through the grass into the unlit backyard and began shining flashlights around the yard and into the windows of the home. Trooper Van Cleave entered the covered back patio connected to the home.

5.25     Trooper Ramos later acknowledged in his report that he believed the north entrance "to be the front door," but he instead followed Trooper Van Cleave down the side of the home to the back.

5.26     Mr. and Mrs. Uhler were watching television in their daylight basement when they noticed dark figures with flashlights in their back yard. They were both in their pajamas. Mrs. Uhler was wearing only pajama shorts and a tank top. Mr. Uhler was wearing shorts and a t-shirt.

5.27     Concerned about burglars, Mrs. Uhler went to get her phone to call 911 while Mr. Uhler went onto the patio to investigate. When Mrs. Uhler heard the individuals identify themselves as law enforcement, she joined Mr. Uhler on the patio.

5.28     The Troopers began shouting at the Uhlers, demanding to know why they had left the scene of the accident and why they hadn't called the police if Mr. Hamid had refused to give insurance information.

5.29     Moments later, when Mr. Uhler took a few steps toward the Troopers, Troopers Mertens and Ramos grabbed his arms while Trooper Van Cleave got out his Taser and held it to Mr. Uhler's neck, threatening to tase him.

5.30     Troopers Mertens and Ramos took Mr. Uhler to the ground and handcuffed him while Trooper Van Cleave pressed his knee onto Mr. Uhler's neck and back.

5.31     Mr. Uhler tried to move and yelled that he felt like he couldn't breathe, but Trooper Van Cleave kept him pressed face down against the ground.

5.32     Troopers Mertens and Ramos handcuffed Mrs. Uhler and told her to sit down in a metal patio chair, which she did.

5.33     Because of the ongoing distress exhibited by Mr. Uhler, Mrs. Uhler asked if she could approach her husband to try to calm him down. Trooper Ramos said that she could, but when she got near Mr. Uhler, Trooper Ramos pulled her back and ultimately forced her back into the chair, injuring her shoulder and back.

ORDER
PAGE - 4

5.34    One of the Troopers then told Mrs. Uhler she was under arrest for obstruction.  Two Troopers took her back up the side of the house and placed her in Trooper Mertens' patrol car.

5.35    Other officers from the Washington State Patrol and the King County Sheriff's Office began arriving on the scene, including the King County Sheriffs "Guardian One" helicopter, which hovered above the Uhlers' property shining a spotlight down on their backyard.

5.36 By this time, a group of the Uhlers' neighbors had gathered along their driveway to watch what was happening.

5.37    A group of officers put Mr. Uhler in leg restraints and carried him up the side of the property where they sat him on the push bars of a patrol car.

5.38    Troopers Ramos, Mertens, and Van Cleave began preparing to take the Uhlers to jail and impound Mr. Uhler's truck in order to search it for evidence of the keys Mr. Hamid alleged had been stolen.  Meanwhile, the Uhlers were kept handcuffed in their pajamas, Mrs. Uhler in the back of Trooper Mertens' patrol car and Mr. Uhler sitting on the push bars of another patrol car in the rain.

5.39    At some point, Washington State Patrol Trooper Daniel Duefrane and Sergeant Pete Stock arrived at the scene.

5.40    Around 10:00 PM, Trooper Duefrane removed Mr. Uhler's leg restraints and escorted him to the front porch.  Trooper Duefrane later wrote in his report: "The front porch was connected to the garage by a covered breezeway.  I observed a front door at the end of the breezeway that led up 3 stairs.  To the left of upstairs there was a set of down stairs that led to a grass lawn with no path to the back of the house on the lake side."

5.41    Sergeant Stock spoke to Mrs. Uhler in the patrol car and Mr. Uhler on the front porch.  Sergeant Stock and Trooper Duefrane then went with Mr. Uhler to the back yard.  As Trooper Duefrane wrote later: "At approximately 2216 Uhler, Sgt. Stock and myself walked down the stairs, through the grass and onto the back covered patio.  As I walked onto the lawn I was not able to observe any lights until I was at the back corner of the residence.  Once we walked onto the covered concrete patio I was able to see into the windows and observed the T.V. was still on.  Uhler explained where he and his wife were sitting and what he observed from inside the residence."

5.42    Trooper Duefrane then went with Mr. Uhler inside the house to retrieve additional clothes for Mr. and Mrs. Uhler.

ORDER
PAGE - 5

  5.43  When they came out of the house, Trooper Mertens told Trooper Duefrane that he planned to impound Mr. Uhler's truck and get a search warrant to look for the missing keys. Trooper Duefrane suggested that instead they ask Mr. Uhler to consent to the search.

  5.44  Mr. Uhler agreed to the search and said "by all means look in there."

  5.45  The search of Mr. Uhler's truck did not reveal any evidence of Mr. Hamid's missing keys.

  5.46  Sergeant Stock informed the Troopers that he and the duty lieutenant had decided the Uhlers would not be taken to jail.

  5.47  Trooper Duefrane removed the handcuffs from Mr. and Mrs. Uhler.

  5.48  Sergeant Stock and Trooper Duefrane accompanied the Uhlers back inside their home, where Sergeant Stock apologized to the Uhlers for how the Troopers had conducted the encounter.

  5.49  As a result of the Defendant Troopers' warrantless entry and excessive use of force, the Uhlers suffered past and ongoing physical injuries, humiliation, and emotional distress, among other injuries.

  5.50  In the days following the March 11, 2016 incident, Mrs. Uhler sought medical attention for her back and shoulder injuries that Defendant Troopers caused during the incident.

  5.51  In the days following the March 11, 2016 incident, Mr. Uhler sought medical attention for injuries to his shoulder, torso, and wrists that Defendant Troopers caused during the incident.

Dkt. #1 at ¶ ¶ 5.1 – 5.51. As a result, the Uhlers have filed the instant matter alleging a violation of their Fourth Amendment rights under 42 U.S.C. § 1983. Dkt. #1 at ¶ 6.1.

  Defendants admit a large portion of the above factual allegations, but deny the facts surrounding the interactions between the Uhlers and the Troopers. Dkt. #12 at ¶ ¶ 5.1 – 5.51. They allege that the Uhlers acted in an escalating and aggressive manner, and yelled at the Troopers with "invectives and profanity." Dkt. #12 at ¶ ¶ 5.29-5.33.

ORDER
PAGE - 6

Discovery has been proceeding in this case, with a discovery deadline of June 19, 2017. Dkt. #15. As part of the discovery process, counsel for Plaintiffs received from Defendants several proposed authorizations for the release of Plaintiffs' medical records. Dkt. #20 at ¶ 1. The proposed authorizations requested that Plaintiffs authorize the release of all medical records and information from each provider, including but not limited to:

> Any and all records regarding my medical, psychological, social, or psychiatric conditions; drug, alcohol, or other substance use or abuse; history, clinical findings, diagnoses, prognoses, treatment, recommendations for future care, general notes, second opinions, and referrals to or from other health care providers; charges, billings, payments, itemized statement of account, liens, pharmacy prescriptions, and reports; all letters and memos sent or received, chart notes, nurse's notes, all test and laboratory results; all x-ray reports; and records regarding sexually transmitted diseases including HIV results, regardless of the form of the records whether written, tape recorded, video taped, photographic, or other imaging by another method.

*See* Dkt. #20 at ¶ 3, Exs. 3 and 4.

Plaintiffs' counsel objected to the proposed authorizations. *See* Dkt. #20 at ¶ 2. At the time Defendants requested the authorizations, they had already deposed Plaintiffs, who had testified to the nature of their physical injuries. Eric Uhler testified that he experienced shoulder muscle pain and was treated for that by an urgent care doctor and his family physician. Dkt. #20 at ¶ 5, Ex. 5 at 70:18–71:23 and 90:24–91:6. Lysa Uhler testified that she experienced and had sought treatment for back and shoulder pain and that the incident aggravated a prior herniated disc injury she sustained in 2002. Dkt. #20 at ¶ 6, Ex. 6 at 91:15–21, 92:15–93:22, 99:21–100:19, 120:19–122:9, 138:6–23 and 139:25–141:21. Plaintiffs had previously provided records of treatment for those injuries with their initial disclosures. Dkt. #20 at ¶ 1.

ORDER
PAGE - 7

Plaintiffs' counsel represented to Defendants that neither of the Uhlers were claiming that the incident caused or exacerbated any specific psychological condition, they had not sought treatment or counseling for any psychological condition, and they would not rely on any medical or expert testimony to support their claim for emotional distress damages. Dkt. #20 at ¶ 2. Accordingly Plaintiffs stated they would authorize the release of medical records related to their claimed injuries (including records of medical treatment before the incident that could show prior injuries), but they would not authorize the release of unrelated records, including mental health records. *Id.*

Counsel conferred by telephone on December 22, 2016. Dkt. #20 at ¶ 3. The parties agreed that Plaintiffs would provide revised stipulations representing the scope of medical records they believe are discoverable. *Id.* at ¶3 and Exs. 3 and 4 thereto. Plaintiffs did so, and the Uhlers specifically did not authorize the release of records of "psychological, social, or psychiatric conditions"; "drug, alcohol, or other substance use or abuse"; or "records regarding sexually transmitted diseases including HIV results." *Id.* Plaintiffs also did not authorize the release of any records from Rite Aid pharmacy because any relevant prescriptions would be duplicative of the records from their medical providers. *Id.*

On January 9, 2017, Plaintiffs' counsel received Defendants' notices of intent to subpoena medical records for Eric Uhler from UW Physicians, Maple Valley UW Medical Clinic, UW Issaquah Neighborhood Clinic, and Rite-Aid Pharmacy; and notices of intent to subpoena medical records for Lysa Uhler from Bellevue Sports & Spine Specialists, CDI Renton East Valley, Overlake MRI, Proliance Orthopaedics & Sports Medicine, Rite-Aid Pharmacy, UW Issaquah Neighborhood Clinic, Maple Valley UW Medical Clinic, and UW Physicians. Dkt. #20 at ¶ 4, Exs. 1 and 2. The notices of intent included the same broad

description of medical records as the original authorizations proposed by Defendants. *Id.* The instant motion followed.

### III.    DISCUSSION

**A. Legal Standards**

A party may serve a subpoena commanding a nonparty "to produce documents, electronically stored information, or tangible things." Fed. R. Civ. P. 45(a)(1)(C). The subpoena is subject to the relevance requirements set forth in Rule 26(b). Under Federal Rule of Civil Procedure 26(b)(1), "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." However, "[a]ll discovery is subject to the limitations imposed by Rule 26(b)(2)(C)." *Id.*

In deciding whether to restrict discovery under Rule 26(b)(2)(C) "the court should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." *Smith v. Steinkamp*, 2002 U.S. Dist. LEXIS 11227, 2002 WL 1364161, at *6 (S.D. Ind. May 22, 2002) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (internal quotations omitted)). *See also*

*Rowlin v. Alabama Dep't. of Pub. Safety*, 200 F.R.D. 459, 461 (M.D. Ala. 2001) (explaining that "courts have the duty to pare down overbroad discovery requests under Rule 26(b)(2) . . . The court should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it, discounted by society's interest in furthering the truthseeking function") (citing *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033-34 (9th Cir. 1990)). In addition, Chief Justice John Roberts has noted the importance of the 2015 amendments to Rule 26. John Roberts, 2015 Year-End Report on the Federal Judiciary (Dec. 31, 2015), *available at* http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf. The Chief Justice has written that the changes that went into effect on December 1, 2015, "may not look like a big deal at first glance, but they are." *Id.* at 5. He went on to discuss that the amendments to Rule 26(b)(1) emphasize the need to impose "reasonable limits on discovery through increased reliance on the common-sense concept of proportionality." *Id.* at 5-6.

    A party lacks standing under Federal Civil Rule 45(c)(3) to challenge a subpoena issued to a non-party unless the party claims a personal right or privilege with respect to the documents requested in the subpoena. *Nova Products, Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238, 241 (S.D.N.Y. 2004); *In re: Cree Inc. Securities Litig*, 220 F.R.D. 443 (M.D.N.C. 2004). A party may move for a protective order in regard to a subpoena issued to a non-party if he or she believes his or her own interest is jeopardized by the discovery sought by a third party, and has standing under Rule 26(c) to seek a protective order regarding subpoenas issued to non-parties which seek irrelevant information. *See Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 231 F.R.D. 426, 429 (M.D. Fla. 2005); *Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 22 (D.D.C. 2005) (deeming a party's motion to quash subpoenas issued to non-

ORDER
PAGE - 10

parties as a motion for protective order under Rule 26(c)); *see also Moon*, 232 F.R.D. at 636-37.

### B. Medical Releases

Plaintiffs ask this Court to enter a Protective Order limiting the scope of discovery of their medical records by Defendants. Plaintiffs acknowledge that medical records related to their alleged injuries, including records of pre-existing conditions, are relevant and should be produced. Dkt. #19 at 4. However, Plaintiffs assert that they have not put their entire medical history at issue in this case, and therefore discovery should be limited. *Id.* Specifically, Plaintiffs argue that Defendants are not entitled to records of mental health treatment, and they are not entitled to records of any medical treatment that is not related to their claimed injuries. *Id.* at 5-7.

Defendants respond that Plaintiffs' psychological, social or psychiatric conditions, as well as any drug, alcohol, and other substance use or abuse are directly relevant to their claimed damages and their behavior, and to Plaintiffs' ability to accurately perceive, recollect, and narrate the events of March 11, 2016. Dkt. #21 at 2.

With respect to Plaintiffs' claimed damages, the Court is not persuaded by Defendants that any psychological/psychiatric records and/or substance use records are relevant. Plaintiffs are clear that they claim only garden-variety emotional distress. Garden-variety emotional distress has been described by one court as "ordinary or common place emotional distress," which is "simple or usual." *Fitzgerald v. Cassil*, 216 F.R.D. 632, 637 (N.D. Cal. 2003). It is contrasted to emotional distress that "'may be complex, such as that resulting in a specific psychiatric disorder'." *Id.* (quoting *Ruhlmann v. Ulster County Dep't of Soc. Servs.*, 194 F.R.D. 445, 449 n.6 (N.D.N.Y. 2000)). When making allegations of "garden-variety"

ORDER
PAGE - 11

emotional distress, a plaintiff does not rely on medical records or medical expert testimony for proof at trial. *See, e.g., EEOC v. Wal-Mart Stores, Inc.*, 276 F.R.D. 637, 640-41 (E.D. Wash. 2011) (collecting cases and finding that the physician-patient privilege was not waived as to plaintiff's medical records because she intended to support her garden-variety emotional distress damages through evidence other than medical records or expert testimony).

Likewise, the Court is not persuaded that Defendants require Plaintiffs' psychological/psychiatric records or records pertaining to substance use in order to present evidence of Plaintiffs' state of mind on the night of the incident. In fact, Defendants admit that they already have Plaintiffs' own testimony that they consumed alcohol prior to the car accident, and prior to their interactions with the Troopers, and that they consumed prescription medications the same day. Dkt. #21 at 2. Defendants can use that information to test Plaintiffs' perceptions and state of mind with respect to their interactions with the Troopers.

For all of the the reasons asserted by Plaintiffs, the Court agrees that the records sought by Defendants are not proportional to the needs of this case, and that the proposed subpoenas are overbroad. *See* Dkt. #23. As a result, the Court will grant Plaintiff's motion for a Protective Order.

## IV. CONCLUSION

Accordingly, having reviewed Plaintiffs' motion, Defendant's opposition thereto, and Plaintiffs' reply in support thereof, along with the remainder of the record, the Court hereby finds and ORDERS that Plaintiffs' Motion for Protective Order (Dkt. #19) is GRANTED. Discovery of Plaintiffs' medical records shall be limited to the authorizations signed by Plaintiffs (Dkt. #20, Exs. 3 and 4).

//

DATED this 10th day of February 2017.

_____
RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE